JONES TRUCK LINES, INC.

v.

ALADDIN SYNERGETICS, INC.

No. 3–93–0442.

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 14, 1994.

David G. Sperry, Independence, MO, Roland M. Lowell, Nashville, TN, for plaintiff, counter-defendant Jones Truck Lines, Inc., debtor–in–possession.

Matthew Joseph Sweeney, III, Tuke, Yopp & Sweeney, Nashville, TN, for defendant, counter-claimant Aladdin Synergetics, Inc.

*MEMORANDUM*

HIGGINS, District Judge.

The Court has before it the defendant's motion (filed November 30, 1993; Docket Entry No. 7) to stay or dismiss, with supporting and opposing memoranda.[1]  Also before the Court is the defendant's unopposed motion (filed December 22, 1993; Docket Entry No. 13) to amend its answer.

For the reasons set forth below, both of the defendant's motions shall be granted.

## I.

Jones Truck Lines (Jones) brings this action against Aladdin Synergetics, Inc. (Aladdin) to recover freight undercharges under the Interstate Commerce Act, 49 U.S.C. § 10101 et seq.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Jones formerly was an active interstate motor carrier.  As such, it was required to "publish and file" its tariff rates for common carriage with the Interstate Commerce Commission (ICC).  49 U.S.C. § 10762.  During the period from July, 1988, to June, 1989, Jones carried several hundred shipments of freight for Aladdin.

On July 9, 1991, Jones filed a Chapter 11 bankruptcy in the United States Bankruptcy Court for the Western District of Arkansas. A subsequent audit revealed a discrepancy between the tariff rates paid by Aladdin and the tariff rates Jones had filed with the ICC. Thus, in the instant action, Jones, as debtor-in-possession, seeks to collect the difference between its filed rates and the amounts paid by Aladdin.[2]

In its initial answer and counterclaim (filed July 15, 1993; Docket Entry No. 3), Aladdin asserts several affirmative defenses, including the following: (1) that some of the shipments in question were carried pursuant to a contract between Jones and Aladdin, and, therefore, Aladdin did not have to pay Jones's filed rates, which only applied to common carriage; (2) that Jones's asserted

---

1.  Defendant's memorandum (filed November 30, 1993; Docket Entry No. 8) in support; plaintiff's response (filed December 10, 1993; Docket Entry No. 11); defendant's reply (filed December 23, 1993; Docket Entry No. 15); plaintiff's response (filed December 30, 1993; Docket Entry No. 17) in opposition to defendant's reply; and

defendant's second reply (filed February 1, 1994; Docket Entry No. 23) to plaintiff's response.

2.  The difference between a carrier's filed rate and the amount actually paid by a shipper is what transportation lawyers refer to as an "undercharge."

rates are not the applicable filed rates; (3) that Jones's filed rates were unreasonable and therefore invalid under 49 U.S.C. § 10701(a); and (4) that the ICC has "primary jurisdiction" to decide each of these affirmative defenses, i.e., whether a carrier operates as a "contract" or "common carrier," whether the asserted rates are the applicable filed rates, and whether the filed rates are unreasonable. In its counterclaim, Aladdin claims that it is entitled to recoupment of the undercharges Jones now seeks to collect because those undercharges are the product of unreasonable rates.[3]

Following the recent enactment of the Negotiated Rates Act of 1993 (N.R.A.), Pub.L. No. 103–180, 107 Stat. 2044, Aladdin moved to amend its answer and counterclaim.[4] Aladdin's amended answer and counterclaim would assert the additional affirmative defense that Jones's efforts to collect undercharges constitute an "unreasonable practice" within the meaning of the N.R.A. Aladdin's amended answer and counterclaim would further assert that the question of whether Jones's efforts are an unreasonable practice also is within the primary jurisdiction of the ICC.

## II.

### A. Aladdin's motion to amend its answer and counterclaim

Federal Rule of Civil Procedure 15(a) provides, in relevant part that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." According to the Supreme Court, "[i]n the absence of any apparent or declared reason ... the leave sought should, as the rules require, be 'freely giv-

en.' " *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 226 (1962). The decision as to whether to grant or deny leave to amend a pleading rests in the discretion of the district court. *Id.; Seals v. Quarterly County Court,* 526 F.2d 216, 219 (6th Cir.1975).

In this case, justice requires that Aladdin be granted leave to amend its answer. Until the enactment of the N.R.A., the defense of "unreasonable practice" was unavailable to Aladdin. *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (holding that the defense of unreasonable practice was inconsistent with the Interstate Commerce Act). However, Congress resurrected this defense in Section 2(e)(1) of the N.R.A. *after* Aladdin had filed its initial answer and counterclaim. In order to allow Aladdin the benefit of the unreasonable practice defense, in accordance with the newly enacted N.R.A., the Court concludes that justice requires that Aladdin's motion to amend be granted.

### B. Aladdin's motion to stay or dismiss

Aladdin's motion to stay or dismiss is essentially a request that this Court "refer" certain important questions to the ICC under the doctrine of primary jurisdiction. The doctrine of primary jurisdiction applies to claims which are properly cognizable in a judicial court but which contain some issue that is within the special competence of an administrative agency. *Reiter v. Cooper,* 507 U.S. ——, ——, 113 S.Ct. 1213, 1220, 122 L.Ed.2d 604, 617 (1993). In such a situation, a court is required to stay further proceedings so as to allow the parties to seek an administrative ruling from the appropriate agency.[5] *Id.*

There is ample authority for Aladdin's assertion that most of the issues it raises in its affirmative defenses are within the primary jurisdiction of the ICC. *E.g., Burlington*

---

3. In *Reiter v. Cooper,* 507 U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993), the Supreme Court held that a shipper's assertion that the carrier's rates were unreasonable constitutes a counterclaim for "recoupment" or "reparations" under 49 U.S.C. § 11705(b)(3), rather than an affirmative defense.

4. The President signed the new statute into law on December 3, 1993.

5. Technically, there is no mechanism for a court to "refer" a question to an administrative agency. Rather, the court merely elects to stay the proceedings or to dismiss the action without prejudice until the administrative agency has ruled on the question pursuant to an administrative complaint filed by one of the parties. *Id.*

*Northern Inc. v. United States,* 459 U.S., 131, 141, 103 S.Ct. 514, 521, 74 L.Ed.2d 311, 320 (1982) (questions of rate reasonableness are within the primary jurisdiction of ICC); *United States v. Western Pac. R.R.,* 352 U.S. 59, 70, 77 S.Ct. 161, 168, 1 L.Ed.2d 126, 135 (1956) (same); *Advance United Express-ways, Inc. v. Eastman Kodak Co.,* 965 F.2d 1347, 1353 (5th Cir.1992) (questions of rate applicability are within the primary jurisdiction of the ICC); *Atlantis Express, Inc. v. Standard Transp. Servs., Inc.,* 955 F.2d 529, 533–34 (8th Cir.1992) (determination of contract or common carriage is within the primary jurisdiction of the ICC). On the other hand, Jones cites some authority to support its contention that referral is not necessary. *E.g., LaSalle Nat'l Bank v. Greater South Traffic Servs.,* Civil No. 4–91–050, slip op. at 3 (D.Minn. May 7, 1992) (question of rate reasonableness should not be referred to ICC except upon threshold showing that ICC could find the rates unreasonable) (copy attached to plaintiff's response to motion to stay or dismiss); *Jones Truck Lines v. Kelly Foods, Inc.,* No. 93–2487–G, slip op. at 3 (W.D.Tenn. Aug. 11, 1993) (determination of contract or common carriage is ordinarily one for court, not ICC) (copy attached to plaintiff's response to motion to stay or dismiss). In any event, the recent enactment of the N.R.A. has rendered much of this debate moot because the N.R.A. specifies which issues shall be decided by the courts and which shall be decided by the ICC.

*1. Issues for referral under the N.R.A.:*

*(a) Rate reasonableness*

■ N.R.A. Section 2(a) provides that shippers who challenge the reasonableness of a non-operating[6] carrier's rates shall not have to pay any undercharges "until *the Commission* has made a determination as to the reasonableness of the challenged rate." N.R.A. § 2(a) (codified at 49 U.S.C. § 10701(f)(6)) (emphasis added). Section 2(a) further provides that any disputes as to a carrier's operating status "shall be resolved *by the court* in which the claim is brought." N.R.A. § 2(a) (codified at 49 U.S.C. § 10701(f)(1)) (emphasis added).

In the instant case, Jones does not contest Aladdin's assertion that Jones is no longer an operating carrier. To the contrary, Jones's own auditor states in his affidavit that Jones "ceased operations in 1992." Supplemental affidavit (filed December 27, 1993; Docket Entry No. 16) of Charles E. Shinn ¶ 9 at 8. Therefore, the Court concludes that Jones is a non-operating carrier and, as such, it may not collect any undercharges in this action until the ICC has resolved whether its filed rates were reasonable.[7]

*(b) Rate applicability*

■ N.R.A. Section 2(a) provides that disputes "as to the rate that was legally applicable ... shall be resolved *by the Commission*" whenever a shipper elects to invoke the Act's mandatory settlement procedures. N.R.A. § 2(a) (codified at 49 U.S.C. § 10701(f)(2), (3), (4)) (emphasis added).

■ Even if Aladdin does not invoke the N.R.A. settlement procedures,[8] the doctrine of primary jurisdiction will still mandate referring the question of rate applicability to the ICC. Matters of rate applicability raise technical questions of tariff construction calling on the expertise of the ICC. *United States v. Western Pac. R.R.,* 352 U.S. 59, 66,

---

6. Section (2)(a) explains that a non-operating carrier is one that "is no longer transporting property or is transporting property for the purpose of avoiding this subsection." N.R.A. § 2(a) (codified at 49 U.S.C. § 10701(a)(f)(1)(A)).

7. The N.R.A. does not make clear whether shippers must make any threshold showing of rate unreasonableness before having a court refer this issue to the ICC. Some courts previously had required such a showing before they would refer the issue to the ICC under the doctrine of primary jurisdiction. *E.g., LaSalle Nat'l Bank v. Greater South Traffic Servs., supra.* In any event, this Court concludes that Aladdin has made a sufficient threshold showing by comparing Jones's filed rates with the rates charged by Jones's competitors. *See* affidavits (filed November 30, 1993 and February 1, 1994; Docket Entry Nos. 10 and 25) of Bettie L. Davis.

8. Aladdin states that it "has not made its election regarding the settlement procedures." Defendant's reply memorandum to plaintiff's response to motion to stay or dismiss at 12. Section 2(a) provides that Aladdin must make its election within ninety days of the date on which Jones notifies it of the availability of the N.R.A. settlement procedures. N.R.A. § 2(a) (codified at 49 U.S.C. 10701(f)(8)(C)).

77 S.Ct. 161, 166, 1 L.Ed.2d 126, 133 (1956); *Advance United Expressways, Inc. v. Eastman Kodak Co.,* 965 F.2d 1347, 1353 (5th Cir.1992). Moreover, whenever a question of rate reasonableness is referred to the ICC, judicial economy favors referring questions of rate applicability as well because of the overlap between these two issues. *Advance United Expressways, Inc.,* 965 F.2d at 1353; *Lewis v. H.B. Fuller,* 1993 WL 244992, *2, 1993 U.S.Dist. LEXIS 9688, *5 (D.Kan. June 18, 1993) (copy appended to defendant's memorandum in support of motion to stay or dismiss).

### (c) Contract or common carriage

■ N.R.A. Section 8 provides as follows:

If a motor carrier ... has authority to provide transportation as a motor common carrier and a motor contract carrier and a dispute arises as to whether certain transportation is provided in its common or contract carrier capacity and the parties are not able to resolve the dispute consensually, *the Commission* shall have jurisdiction to, and shall, resolve the dispute.

N.R.A. § 8 (emphasis added). Accordingly, N.R.A. Section 8 mandates that this Court refer to the ICC the question of whether Jones, in transporting Aladdin's shipments, acted as a common carrier or a contract carrier.

### (d) Unreasonable practice

■ N.R.A. Section 2(e)(1) resurrects the defense of unreasonable practice by providing as follows:

[I]t shall be an unreasonable practice for a motor carrier ... to attempt to charge or to charge for a transportation service provided before September 30, 1990, the difference between the applicable [filed] rate ... and the negotiated rate for such transportation service if the carrier ... is no longer [operating as an interstate carrier].

N.R.A. § 2(e)(1).

N.R.A. Section 2(e)(2) provides that the ICC, rather than the courts, shall decide whether a carrier's efforts to collect undercharges constitute an unreasonable practice. Section 2(e)(2) states as follows:

*The Commission* shall have jurisdiction to make a determination of whether or not attempting to charge or the charging of a rate by a motor carrier ... is an unreasonable practice under paragraph (1). If *the Commission* determines that attempting to charge or the charging of the rate is an unreasonable practice under paragraph (1), the carrier ... may not collect the [undercharge].

N.R.A. § 2(e)(2) (emphasis added).

In its amended answer and counterclaim, Aladdin asserts that Jones's efforts to collect undercharges in the instant action constitute an unreasonable practice. Accordingly, this Court must refer the matter to the ICC for its consideration under N.R.A. Section 2(e)(2).

### 2. Applicability of the N.R.A. to bankrupt carriers

■ In a last-ditch attempt to avoid the effects of the N.R.A., Jones contends that the Act does not apply to bankrupt carriers. Jones rests this argument on N.R.A. Section 9, which provides that "[N]othing in this Act ... shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy...." This Court finds little merit in Jones's argument.

It is the foremost principle of statutory interpretation that the interpreting court "is to construe the language so as to give effect to the intent of Congress." *United States v. Underhill,* 813 F.2d 105, 111 (6th Cir.), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987). If the "literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters ..., the intention of the drafters, rather than the strict language, controls." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290, 299 (1989).

The interpretation urged by Jones is absurd and patently at odds with Congress' intent in enacting the N.R.A. As revealed in its legislative history, the N.R.A. was enacted as a response to the billions of dollars in undercharge actions brought by *bankrupt* carriers.

The bill, as reported, is intended to alleviate the freight motor carrier "undercharge" litigation crisis by establishing a statutory procedure for resolving disputes from efforts by trustees for *bankrupt* motor carriers ... to collect additional amounts for past transportation....

Sen.Rpt. 103–79 (emphasis added).

The purpose of H.R. 2121, as reported, is to provide a statutory process for resolving claims involving negotiated transportation rates brought about by *trustees of non-operating motor carriers* for past transportation services.

House Rpt. 103–359 (emphasis added), U.S.Code Cong. & Admin.News 1993, p. 2534. This Court construes the N.R.A., consistent with Congress' intent, as applying to bankrupt carriers.[9]

### III.

For the reasons set forth above, the defendant's motion to amend shall be granted.

The defendant's motion to stay shall be granted so as to stay these proceedings until the ICC has answered the following four questions:

(1) Did Jones provide the transportation services at issue in its capacity as a common carrier or as a contract carrier?

(2) Are the rates asserted by Jones the applicable filed rates, and if not, what are the applicable filed rates?

(3) Are the applicable filed rates unreasonable?

(4) Do Jones's efforts to collect the undercharges at issue constitute an unreasonable practice?

---

9. Jones's assertion that Section 2(a) of the N.R.A. conflicts with Section 541(c)(1) of the Bankruptcy Code is based on a misreading of the these statutes. Section 2(a) provides for a statutory settlement of undercharge claims (i.e., 15 percent or 20 percent of the amount of the claim), *provided that "the carrier ... is no longer transporting property."* N.R.A. § 2(a) (codified at 49 U.S.C. § 10701(f)(1)(A)). In contrast, Section 541(c)(1) forbids any modification to a bankruptcy estate's interest in property that is *"conditioned on the insolvency or financial condition of the debtor."* 11 U.S.C. 541(c)(1). The plain language of two statutes shows the absence of any conflict. The operation of Section 2(a) turns on whether the carrier is still transporting property, whereas the operation of Section 541(c)(1) depends on the financial status of the debtor. These two criteria are not the same. In the brief two months since enactment of the N.R.A., at least one court already has ruled that Section 2(a) had no effect on the undercharge claims of a bankrupt carrier that was still transporting property under Chapter 11 of the Bankruptcy Code. *Gross Common Carrier, Inc. v. A.B. Dick Co.,* 861 F.Supp. 638 (N.D.Ill.1993) (copy appended to defendant's second reply memorandum).