Thomas F. MILLER, as Trustee of
the Bankruptcy Estate of Hyman
Freightways, Inc., Plaintiff,

v.

WD–40 COMPANY, Defendant.

Civil No. 98–1663 (DSD/JMM).

United States District Court,
D. Minnesota.

Nov. 30, 1998.

Margie Ruth Bodas, Geraint David Powell, Lommen Nelson Cole & Stageberg, Minneapolis, MN, for Plaintiff.

Barbara Resanovich Kueppers, Kueppers Law Office, Minneapolis, MN, Mary Kay Reynolds, Reynolds Law Office, Culver, CA, for Defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on the motion of defendant WD–40 Company to stay judicial proceedings in this matter to enable referral of certain transportation issues to the Surface Transportation Board. Based on a review of the file, record, and proceedings herein, the court denies defendant's motion.

## BACKGROUND

Plaintiff Thomas Miller is the trustee of the Bankruptcy Estate of Hyman Freightways, Incorporated (hereafter "Hyman"), a Minnesota company. Hyman filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code on July 23, 1997. Hyman ceased operating in October 1997, and the case was converted to a Chapter 7 proceeding on November 12, 1997.

Defendant WD–40 Company (hereafter "WD–40") is a California company and former customer of Hyman.

At all relevant times, Hyman was a motor carrier. Motor carriers traditionally operated as common or contract carriers. Common carriage involves services that are held out without preference to all shippers; contract carriage is limited to shippers with which carriers enter into specific agreements or contracts. *See Bankruptcy Estate of United Shipping Co., Inc. v. General Mills, Inc. .*, 34 F.3d 1383, 1388 (8th Cir.1994) (providing an overview of the regulation of motor carriers). A carrier may be licensed to operate in one or both capacities. With the passage of the ICC Termination Act of 1995, Pub.L. 014–88, 109 Stat. 803, effective January 1, 1996, however, the historic distinction between these two types of carriage has been called into question.

Hyman and WD–40 entered into "Transportation Contract # 1113," effective from April 1, 1996, through March 31, 1997, which contained the pricing terms by which Hyman provided freight service to WD–40. *See* Transportation Contract # 1113, Exhibit A to Declaration of Robert J. Walters (Docket No. 9). After expiration of the contract, Hyman continued to provide freight services to WD–40. At issue in this case are the pricing terms for 987 shipments Hyman transported for WD–40 between May 14, 1997, and September 30, 1997. Hyman alleges that after termination of the contract the services provided to WD–40 were performed as a motor common carrier, and it is therefore entitled to collect common carriage "class rates" set forth in published tariff schedules. WD–40, on the other hand, alleges that the parties had a mutual agreement that Transportation Contract # 1113 would continue in force after its expiration on March 31, 1997, and that Hyman would continue to charge WD–40 the rates set out in the contract which were lower than the prevailing class rates.

Miller, as trustee of the Hyman bankruptcy estate, filed an adversary proceeding on April 28, 1998, in the bankruptcy court against WD–40, seeking to recover $166,-396.08 in additional freight payments allegedly due from WD–40. These additional pay-

ments constitute the difference between the tariff rates charged by Hyman after March 31, 1997, and the contract rates agreed to by the parties in Transportation Contract #1113 that WD-40 alleges remained in effect by mutual agreement after the expiration of the contract. This matter was transferred from the bankruptcy court to this court by order of the Honorable Robert J. Kressel, United States Bankruptcy Judge, dated July 7, 1998.

WD-40 now brings this motion to stay judicial proceedings to enable referral of the following issues to the Surface Transportation Board:

> Whether, subsequent to March 31, 1997, Hyman performed common carriage or contract carriage with respect to WD-40's 987 shipments at issue?

> Whether the Hyman class tariff rates and rules Plaintiff is seeking to impose to support the additional charges are applicable?

> Whether Plaintiff's actions in attempting to collect from WD-40 tariff rates based on tariff rules and higher tariff "class rates" than the contractually agreed to rates and rules as billed and collected at the time Hyman transported WD-40's 987 shipments constitute an unreasonable practice under 49 U.S.C. § 13711?

> Whether the tariff "class rates" and additional charges Plaintiff seeks to impose for shipments subsequent to March 31, 1997 are reasonable, based upon the requirement of both common and statutory law that common carriers' rates must be reasonable?

> Whether Hyman properly participated in and adopted any such collectively made agreements and tariffs upon which Plaintiff is basing his additional charge claims, such that the identified "class rates" and tariffs Plaintiff is now seeking to impose are effective?

Defendant WD-40 Company's Memorandum in Support of Motion to Stay Judicial Proceedings (Docket No. 8) at 1-2. After oral argument, this matter is now properly before the court for decision.

## DISCUSSION

The doctrine of primary jurisdiction is concerned with promoting proper relationships between the courts and administrative agencies charged with performing particular regulatory duties. *U.S. v. Western Pac. R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Red Lake Band of Chippewa Indians v. Barlow,* 846 F.2d 474, 476 (8th Cir.1988) (noting that primary jurisdiction "is a common law doctrine used to coordinate administrative and judicial decision making."). Primary jurisdiction comes into play whenever enforcement of a claim originally cognizable in the courts requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. *Western Pacific,* 352 U.S. at 64, 77 S.Ct. 161; *Atlantis Exp., Inc. v. Standard Transp. Services, Inc.,* 955 F.2d 529, 532 (8th Cir.1992). *See also DeBruce Grain, Inc. v. Union Pacific R. Co.,* 149 F.3d 787, 789 (8th Cir.1998) ("Under the doctrine of primary jurisdiction a court may leave an issue for agency determination when it involves the special expertise of the agency and would impact the uniformity of the regulated field.") (citing *Access Telecommunications v. Southwestern Bell,* 137 F.3d 605, 608 (8th Cir.1998)).

Primary jurisdiction should be invoked when " 'the reasons for the existence of the doctrine are present and ... the purposes it serves will be aided by its application in the particular litigation.' " *Zurek Exp., Inc. v. Intermetro Industries Corp.,* 775 F.Supp. 1215, 1216 (D.Minn.1991) (quoting *U.S. v. McDonnell Douglas Corp.,* 751 F.2d 220, 224 (8th Cir.1984)). There is no fixed formula for applying the doctrine of primary jurisdiction, and reasons for referring a matter to an agency include uniformity in statutory and regulatory construction, utilization of the agency's specialized knowledge, and policy considerations. *Atlantis,* 955 F.2d at 532-33. Referral of a matter to an administrative agency is especially appropriate "if the expertise of the agency would contribute meaningfully toward securing uniform and consistent regulation of business." *Zurek,* 775 F.Supp. at 1217.

In analyzing the issues presented by defendant's motion, the court recognizes that regulation of the interstate trucking industry has undergone great change in recent years. The ICC Termination Act of 1995 ("ICCTA")

effectively eliminated tariff filing requirements and the distinction between "common carriers" and "contract carriers." Case law analyzing the statutory and regulatory environment prior to ICCTA, therefore, is now largely inapplicable. The court is also aware of both the dearth of reported cases since the effective date of ICCTA dealing with the issues raised here and the need for the Surface Transportation Board to set policy in this area.

While defendant's memorandum in support of its motion discusses a number of questions that defendant argues should be referred to the Surface Transportation Board, at oral argument the parties winnowed this matter down to one critical issue, the applicability of various shipping rates to the 987 shipments moved by plaintiff from May 14, 1997, to September 30, 1997. When the court asked defendant at oral argument what the Surface Transportation Board would decide if this matter was referred to that agency, defendant answered "applicability of rates," and agreed that after the question concerning which rate applies is resolved, nothing remains for decision. The court must therefore determine whether the parties' dispute over the applicable rates belongs here or before the Surface Transportation Board.

■ For shipments occurring prior to January 1, 1996, 49 U.S.C. § 13710(b) provides:

**Resolution of disputes over status of common carrier or contract carrier.**—If a motor carrier (other than a motor carrier providing transportation of household goods) ... that had authority to provide transportation as both a motor common carrier and a motor contract carrier and a dispute arises as to whether certain transportation that was provided prior to January 1, 1996, was provided in its common carrier or contract carrier capacity and the parties are not able to resolve the dispute consensually, the Board shall resolve the dispute.

Thus, for shipments occurring prior to January 1, 1996, referral to the ICC [1] was mandatory in a situation such as this. As pointed out by plaintiff, however, the 987 shipments that are at the heart of this dispute all occurred after January 1, 1996, when the status of a carrier as a "common carrier" or "contract carrier" was no longer determinative. There is thus no mandatory requirement that this case be referred to the Surface Transportation Board.

The cases cited by defendant for the proposition that the Surface Transportation Board has primary jurisdiction to determine whether a contract or common carriage relationship exists here predate ICCTA. *See General Mills*, 34 F.3d at 1391 ("[T]he determination whether a contract carriage or common carriage relationship existed ... is a matter within the primary jurisdiction of the ICC."); *Atlantis Exp.*, 955 F.2d at 533–34 (referring to ICC the issue of whether carrier transported shipments pursuant to its contract carrier authority). Because these cases predate the elimination of the distinction between common and contract carriage, the court finds them inapplicable in determining in which forum the dispute presented here should be decided.

■ Carriers are explicitly allowed to enter into contracts with shippers to provide specified services under specified rates and conditions. Further, 49 U.S.C. § 14101(b) provides that "[t]he exclusive remedy for any alleged breach of a contract entered into ... shall be an action in an appropriate State court or United States district court, unless the parties agree otherwise." The question here is whether the parties agreed to continue Transportation Contract # 1113 after its expiration on March 31, 1996. While transportation law is admittedly a highly complex web of statutory and administrative regulation, the issue here is one of simple fact; specifically, whether the negotiated rate of Transportation Contract # 1113 or a common tariff applies. Because no issues of national transportation policy are implicated, this is a question best left to a jury.

In its memorandum, defendant discusses a number of questions that may arise if plaintiff is found to have provided common carriage for the 987 shipments. These issues include the reasonableness of plaintiff's collection practices, the reasonableness of the

---

1. The Interstate Commerce Commission was eliminated by ICCTA, and the Surface Transportation Board was created to perform the functions previously performed by the Commission.

rates charged by plaintiff, and the applicability of certain tariffs. As an initial matter, the court notes that these issues are of secondary importance vis-a-vis the determination of which rate should be applied to the 987 shipments. Further, the court finds that the statutory sections referred to by defendant are not applicable in this case.

First, as to the alleged unreasonableness of plaintiff's collection practices, the applicable statute provides:

> It shall be an unreasonable practice for a motor carrier of property (other than a household goods carrier) providing transportation to attempt to charge or to charge for a transportation service the difference between (1) the applicable rate that was lawfully in effect *pursuant to a tariff that was filed in accordance with [49 U.S.C. § 13701 et. seq.]* or, with respect to transportation provided before January 1, 1996, ... as in effect on the date the transportation was provided, by the carrier or freight forwarder applicable to such transportation service, and (2) the negotiated rate for such transportation service[.]

49 U.S.C. § 13711(a) (emphasis added). The statute further provides that "The Board shall have jurisdiction to make a determination of whether or not attempting to charge or the charging of a rate by a motor carrier ... is an unreasonable practice under [49 U.S.C. § 13711(b) ]." 49 U.S.C. § 13711(b)(1).

■ Because the transportation at issue occurred after January 1, 1996, § 13711(b)(1) is applicable only if the tariff involved was filed in accordance with 49 U.S.C. § 13701 et. seq. Such tariffs include those applicable to either household goods transportation or the noncontiguous domestic trade and those made collectively by motor carriers under an approved rate bureau agreement. *See Associated Traffic Services, Inc.—Petition for Declaratory Order—Certain Rates and Practices of Saia Motor Freight Line, Inc.,* STB Docket No. 41966, Service Date May 8, 1998 (attached to memorandum of defendant). In the *Associated Traffic* decision, the Surface Transportation Board specifically noted that "as to those shipments which moved after the effective date of TIRRA, the rates involved here are not subject to our rate reasonableness jurisdiction because, being individually set rates for ground transportation of general freight, they are not subject to section 13701." *Id.* at page 2 of 6. Because this case does not involve tariffs that must be filed,[2] § 13711(b)(1) does not confer primary jurisdiction on the Board to determine whether plaintiff's collection practices were unreasonable.

Defendant next contends that even if plaintiff is found to be a common carrier whose rates are applicable and practices reasonable, the question of the reasonableness of its rates is best left to the Surface Transportation Board. Citing pre-ICCTA cases and 49 U.S.C. § 13709(f),[3] defendant argues that "rate reasonableness analysis" is best determined by the STB in the exercise of its primary jurisdiction. First, the court has serious doubts that § 13709, with its referral provision, applies in this case. Section 13709 contains references to the rate "legally on file" and "rate filed tariff." *See* 49 U.S.C. §§ 13709(a)(1)(B)(i) and (v), indicating that "rate reasonableness analysis" should be conducted by the Board only in situations involving a carrier seeking rate "undercharges" based on the filed rate doctrine.

---

2. While collective tariffs are within the jurisdiction of the Surface Transportation Board, defendant has not offered any evidence that plaintiff is relying on a collective tariff. *See* Declaration of Peter Martin (Docket No. 14) at ¶ 2 ("The exact charges levied against WD–40 were according to Hyman's private tariff which was published through the Middle West Motor Freight Bureau—a bureau with which Hyman participated as a member for the purpose of publicly identifying applicable rates."). Simply because the tariff was published through the Middle West Motor Freight Bureau does not mean it is a collective tariff.

3. 49 U.S.C. § 13709(f) provides:

> When a person proceeds under this section to challenge the reasonableness of the legally applicable freight charge or charges being claimed by a carrier or freight forwarder in addition to those already billed and collected, the person shall not have to pay any additional compensation to the carrier or freight forwarder until the Board has made a determination as to the reasonableness of the challenged rate as applied to the freight of the person against whom the claim is made.

More important, even if the court were to find referral appropriate, defendant has failed to meet the necessary burden before referral can be granted. Before referring a question of rate reasonableness to the Board, the court must determine whether "the party challenging reasonableness has presented sufficient evidence of rate unreasonableness to warrant referral." *Zurek*, 775 F.Supp. at 1217. In *In re Sharm Exp., Inc.*, 127 B.R. 620 (D.Minn.1991), Judge Murphy held that where a shipper fails to present evidence to support an allegation of rate unreasonableness other than argument that the challenged rate is "unreasonable on its face," the shipper is not entitled to referral. *Id.* at 622–24. In a well-cited portion of the opinion, Judge Murphy noted:

> Allowing [a shipper] to resist withdrawal of reference from the ICC by a mere incantation of the doctrine of primary jurisdiction would be tantamount to allowing the doctrine to become "an abstraction to be called into operation at the whim of the pleader."

*Id.* at 624 (quoting *Western Pacific*, 352 U.S. at 69, 77 S.Ct. 161). Evidence found to be sufficient to justify referral includes affidavit testimony showing a significant disparity between the tariff rates sought to be charged and the rates charged by other carriers. *See In re Sharm Express, Inc.*, Civil No. 4–91–32, 1991 WL 156573 at *6 (D.Minn. Aug.7, 1991).

Here, defendant has done nothing more than make conclusory assertions that plaintiff's rates are unreasonable. No expert affidavit has been submitted. Defendant simply relies on: (1) the fact affidavits of Robert Walters and Randy Barry, who state that defendant had its choice of carriers with comparable rates for the time period at issue and used plaintiff because of its competitive rates; and (2) the argument that the contract rates set forth in Transportation Contract # 1113 establish a baseline from which the reasonableness of the plaintiff's tariff rates can be compared. This is inadequate evidence to justify referral, as such evidence says nothing about the difference between the tariff rates plaintiff seeks to charge and those charged by other carriers. Because defendant has not provided any evidence to support its allegation that the rates plaintiff seeks to charge are unreasonable, referral to the Board on this issue is not appropriate.

Finally, defendant contends that the Surface Transportation Board has primary jurisdiction to determine issues of applicability for collectively set tariffs and that plaintiff's tariffs are ambiguous. However, as is plain from the facts, this case does not involve collectively set tariffs. Further, defendant has failed to point out why the rates sought to be charged by plaintiff are ambiguous. *See* Defendant WD–40 Company's Memorandum of Points and Authorities (Docket No. 8) at 14 ("[I]t is impossible at this point to comment on all of the factors involved in WD–40's applicability challenge."). As discussed previously, defendant did not pursue this challenge at oral argument, and in light of defendant's agreement that the question here is the applicability, not ambiguity of certain tariffs, the court declines to refer this issue to the Surface Transportation Board.

Primary jurisdiction requires that a dispute regarding tariff construction be referred to the Surface Transportation Board if interpretation of a disputed term or phrase implicates larger issues of transportation policy that demand uniform administration by an expert body. *DeBruce Grain, Inc. v. Union Pacific R. Co.*, 983 F.Supp. 1280, 1285 (W.D.Mo.1997), *aff'd*, 149 F.3d 787 (8th Cir. 1998). The court finds no such issues presented here, and by referring this dispute to the Surface Transportation Board, the court would turn this breach of contract action into a more complex dispute than necessitated by the facts. For all the reasons discussed, therefore, the court declines to stay this action to enable referral of certain issues to the Surface Transportation Board.

### CONCLUSION

Based on a review of the file, record, and proceedings herein, the court finds that a stay of the proceedings in this matter to allow referral of certain transportation issues to the Surface Transportation Board is not warranted. Therefore, **IT IS HEREBY ORDERED** that the motion of defendant WD–40 for a stay of judicial proceedings to

enable referral of transportation issues to the Surface Transportation Board is denied.